ANTHONY M. BARNES, SBN 199048
Email: amb@atalawgroup.com
JASON R. FLANDERS, SBN 238007
Email: jrf@atalawgroup.com
AQUA TERRA AERIS (ATA) LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (917) 371-8293

*Attorney for Plaintiffs*
SAN JOAQUIN RAPTOR/WILDLIFE RESCUE
CENTER, CENTRAL VALLEY SAFE
ENVIRONMENT NETWORK, and
PROTECT OUR WATER

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER a non-profit corporation, CENTRAL VALLEY SAFE ENVIRONMENT NETWORK, a non-profit association, and PROTECT OUR WATER, a non-profit association,<br><br>Plaintiffs,<br><br>vs.<br><br>STERICYCLE, INC., a Delaware corporation,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

San Joaquin Raptor/Wildlife Rescue Center ("SWR/WRC"), Central Valley Safe Environment Network ("CVSEN") and Protect Our Water ("POW") (collectively, "Plaintiffs"), by and through its counsel, hereby allege:

I.      **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On September 30, 2020 and October 15, 2020, Plaintiffs issued 60-day notice letters ("Notice Letter") to Stericycle, Inc ("Defendant" or "Stericycle"), for the industrial facility under its control in Fresno, California. The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and amended by o Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("Strom Water Permit"), and the Clean Water Act at the Stericycle facility in Fresno County located at 4135 West Swift Avenue Fresno, CA 90058 with Waste Discharger Identification Number (WDID) 5F10I026017 ("Facility").

3.      The Notice Letter informed Defendant of Plaintiffs' intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

4.      The Notice Letter was sent to Defendant's Chief Executive Officer, Cindy J. Miller, Eloy Jimenez, District Manager, and Joshua Hanson, Operations Manager. (40 C.F.R. § 135.2(a)(2)). The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive

Officer of the Regional Water Quality Control Board, Central Valley Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

5.      More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. Plaintiffs are informed and believes, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6.      Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.      <u>INTRODUCTION</u>

7.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

8.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.     Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.    This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

11.    Plaintiffs specifically allege violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

III.    **PARTIES**

    **A.    San Joaquin Raptor/Wildlife Rescue Center, Central Valley Safe Environmental Network, and Protect Our Water**

12.    SJR/WRC, CVSEN & POW are a California non-profit corporation and two California non-profit association respectively, with their principal place of business in Merced,

_____

[1] The Facility are fully described in Section V below.

1   California. Plaintiffs' organizational purposes are preserving wildlife habitats and the environment,

2   including the waterways in the San Joaquin Valley, including but not limited to the San Joaquin

3   River upon which wildlife depends. Plaintiffs' efforts to protect the resources of the San Joaquin

4   Valley include air and water quality, the preservation of agricultural land, and the protection of

5   wildlife and its habitat. All three entities are also committed to public education regarding these

6   various issues and ensuring governmental compliance with the law of this state. Members of

7   SJR/WRC, CVSEN & POW use and enjoy California's numerous rivers, creeks and waterways for

8   recreation and other activities, including the San Joaquin River, where they view and enjoy wildlife,

9   rescue and rehabilitate wildlife, and spend time boating, birdwatching, and engaging in scientific

10  study, among other things. SJR/WRC, CVSEN & POW's members derive significant and ongoing

11  use and enjoyment from the aesthetic, recreational, and conservation benefits of the San Joaquin

12  Valley watersheds.

13          13.     Plaintiffs have approximately 1,800 members, collectively, who live, recreate and

14  work in and around waters of the State of California, including the San Joaquin River and the San

15  Joaquin River watershed. Plaintiffs are dedicated to the preservation, protection, and defense of the

16  environment, and the wildlife and the natural resources of all waters of California. To further these

17  goals, Plaintiffs are actively seeking federal and state agency implementation of the Clean Water

18  Act and other laws and, where necessary, directly initiating citizen enforcement. As referenced in

19  Paragraph 12, members of SJR/WRC, CVSEN & POW use and enjoy the Receiving Waters herein

20  into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

21  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such

22  threats and impairments. Thus, the interests of SJR/WRC's, CVSEN's & POW's members have

23  been, are being, and will continue to be adversely affected by Defendant's ongoing failure to

24  comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will

25  redress the harms to Plaintiffs caused by Defendant's activities.

26          14.     Defendant's failure to comply with the procedural and substantive requirements of

27  the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's

28  discharge of polluted stormwater and non-stormwater from the Facility, negatively impacts and

1    impairs Plaintiffs' members' use and enjoyment of these waters.

2        15.    Continuing commission of the acts and omissions alleged herein will irreparably

3    harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate remedy at law.

4        **B.    The Owner and/or Operator of the Stericycle Facility**

5        16.    Plaintiffs are informed and believe, and thereon allege, that Stericycle, Inc. maintains

6    its headquarters at 2355 Waukegan Rd., Bannockburn, IL 60015.

7        17.    Plaintiffs are informed and believe, and thereon allege, that Defendant is the owner

8    of the Facility in Fresno.

9        18.    Plaintiffs are informed and believe, and thereon allege, that Defendant is the operator

10   of the Facility.

11       19.    Plaintiffs refer to Defendant and its management herein as the "Owners/Operators"

12   of the Facility.

13       20.    Plaintiffs are informed and believe, and thereon allege, that Defendant is an active

14   California corporation registered in Delaware.

15       21.    Plaintiffs are informed and believes, and thereon allege, that the name and address of

16   the Registered Agent for Stericycle, Inc. is CT Corporation System, 818 West Seventh Street, Suite

17   930, Los Angeles, CA 90017.

18   **IV.    <u>STATUTORY BACKGROUND</u>**

19       **A.    The Clean Water Act**

20       22.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge

21   of any pollutant into waters of the United States unless the discharge complies with various

22   enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not

23   authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System

24   ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

25       23.    Section 402(p) of the CWA establishes a framework for regulating municipal and

26   industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with

27   approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

28   water discharges through individual permits issued to dischargers and/or through the issuance of a

1  single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

2  1342.

3       24.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point

4  source dischargers, including those discharging polluted storm water, must achieve technology-

5  based effluent limitations by utilizing Best Available Technology Economically Achievable

6  ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control

7  Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. §

8  125.3(a)(2)(ii)-(iii).

9       25.    The Clean Water Act requires point source discharges of pollutants to navigable

10  waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

11       26.    The "discharge of a pollutant" means, among other things, "any addition of any

12  pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

13       27.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue,

14  sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive

15  materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal,

16  and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

17       28.    The term "point source" means any "discernible, confined and discrete conveyance,

18  including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure,

19  container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft,

20  from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

21       29.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

22       30.    "Waters of the United States" are defined as "navigable waters," and "all waters

23  which are currently used, were used in the past, or may be susceptible to use in interstate or foreign

24  commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

25       31.    The EPA promulgated regulations for the Section 402 NPDES permit program

26  defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the

27  United States to include not only traditionally navigable waters but also other waters, including

28  waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters

including intermittent streams that could affect interstate commerce.

32.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

33.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

34.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

35.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

36.     The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

38.     Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA $37,500 per day per violation for all Clean Water Act violations after January 12, 2009 and $55,800.00 per day per violation for violations that occurred after November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

39.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

///

**B.      California's Storm Water Permit**

40.      Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

41.      Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

42.      The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

43.      Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

44.      The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.      On July 1, 2015, the current Storm Water Permit became effective and was issued as

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

NPDES General Permit No. CAS000001 Order No. 2014-0057-DWQ. Storm Water Permit, Section I(A) (Finding 4).

46.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

47.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I(A) (Finding 17), Section II(B).

48.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

C.      **The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

49.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

50.     Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead,

1  and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include

2  biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

3       51.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water

4  discharges that cause or threaten to cause pollution, contamination, or nuisance.

5       52.     Under the CWA and the Storm Water Permit, dischargers must employ Best

6  Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water

7  pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Effluent Limitation V(A). EPA has developed

8  benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's

9  BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge

10  Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial

11  Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector

12  Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746,

13  64,766-67 (Oct. 30, 2000).

14       53.     The EPA established Parameter Benchmark Values for the following parameters,

15  among others, are as follows: total suspended solids ("TSS")—100 mg/L; oil & grease ("O&G")—

16  120 mg/L; magnesium (:Mg")—.75 mg/l; iron ("Fe")—1 mg/l; ammonia ("NH")—2.14 mg/L;

17  copper ("Cu")—.0123 mg/l; zinc ("Zn")—.11 mg/L; pH—6-9 s.u.; and nitrate & nitrite nitrogen

18  ("N+N")—0.68 mg/L. The Basin Plan's Water Quality Standards for the Los Angeles Region

19  requires a narrower pH range of 6.5—8.5 pH units. The Storm Water Permit contains Numeric

20  Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

21       54.     The Storm Water Permit includes NALs. Storm Water Permit, Section I(M) (Finding

22  62). During the public commenting period, the State Board stated that "NALs are not designed or

23  intended to function as numeric technology-based effluent limitations." State Board 2012 Draft

24  Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* Storm

25  Water Permit Section I(M) (Finding 63).

26       55.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibit storm water

27  discharges from adversely impacting human health or the environment.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

56. Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

57. Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

58. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

59. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

60. The State Water Quality Control Board, Central Valley Region, has issued the Water Quality Control Plan for the for the Central Valley Basins ("Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states the "All waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan, 3.1.2. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-1. The Basin Plan decrees that waters shall not contain chemical constituents, discoloration, substances or floating material in concentrations that cause nuisance or adversely affect beneficial uses. *Id.* at 3.1

61. The Basin Plan specifies existing beneficial uses for the San Joaquin River including municipal and domestic supply, contact and non-contact recreation, commercial and sportfishing, cold and warm freshwater habitat, wildlife habitat, migration of aquatic organisms, and spawning, reproduction and/or early development. Basin Plan, Table 2-1

62. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

63.     Pursuant to Clean Water Act Section 303(d) list of impaired waterbodies, the San Joaquin is impaired for boron, chlorpyrifos, diazinon, toxicity, DDT, pesticides, invasive species, and pH.

64.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

65.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

66.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

67.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitations and Section VI(A) of the Storm Water Permit.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

68.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

1  authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The

2  SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated

3  with industrial activities in storm water and authorized non-storm water discharges. Storm Water

4  Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions

5  attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

6       69.     The SWPPP must include: a narrative description and summary of all industrial

7  activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm

8  water conveyance system, associated points of discharge, direction of flow, areas of actual and

9  potential pollutant contact, including the extent of pollution-generating activities, nearby water

10  bodies, and pollutants control measures; a description of storm water management practices; a

11  description of the BMPs to be implemented to reduce or prevent pollutants in storm water

12  discharges and authorized non-storm water discharges; the identification and elimination of non-

13  storm water discharges; the location where significant materials are being shipped, stored, received,

14  and handled, as well as the typical quantities of such materials and the frequency with which they

15  are handled; a description of dust and particulate-generating activities; and a description of

16  individuals and its current responsibilities for developing and implementing the SWPPP. Storm

17  Water Permit, Section X.

18       70.     The objectives of the SWPPP are to identify and evaluate sources of pollutants

19  associated with industrial activities that may affect the quality of storm water discharges, to identify

20  and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to

21  reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water

22  Permit, Section X.

23       71.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual

24  basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water

25  Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an

26  annual comprehensive site compliance evaluation that includes a review of all visual observation

27  records, inspection reports and sampling and analysis results, a visual inspection of all potential

28  pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a

1  review and evaluation of all BMPs to determine whether the BMPs are adequate, properly

2  implemented and maintained, or whether additional BMPs are needed, and a visual inspection of

3  equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

4      72.     The SWPPP and site maps must be assessed annually and revised as necessary to

5  ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).

6  Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within

7  30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the

8  SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at

9  Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).

10     **E.     The Storm Water Permit's Monitoring and Reporting Requirements**

11     73.     The Storm Water Permit requires facility operators to develop and implement a

12 Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)-XI(D). The

13 MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions,

14 Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm

15 Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce

16 pollutants in storm water and authorized non-storm water discharges are evaluated and revised to

17 meet changing conditions at the facility, including revision of the SWPPP. *Id.*

18     74.     Further objectives of the MIP are to ensure that BMPs have been adequately

19 developed and implemented, revised if necessary, and to ensure that storm water and non-storm

20 water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent

21 Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

22     75.     The MIP aids in the implementation and revision of the SWPPP and measures the

23 effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id.*

24     76.     The Storm Water Permit requires facility operators to monitor and sample storm

25 water discharges to ensure that the facility is complying with the terms of the permit. Storm Water

26 Permit, Sections I(J) (Findings 55-56) and XI.

27     77.     Section XI(A)(4) of the Storm Water Permit require that the MIP shall be revised as

28 necessary to ensure compliance with the Storm Water Permit.

78.     Section XI(A) of the Storm Water Permit require dischargers to conduct monthly visual observations of storm water discharges.

79.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

80.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

81.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

82.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

83.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

84.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has

addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

85.     Section XI(B)(2) of the Storm Water Permit requires a discharger to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

86.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Board.

87.     Section XVI of the Storm Water Permit requires a discharger to certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS and include: 1) a compliance checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of this General Permit; 2) an explanation for any non-compliance of requirements within the reporting year, as indicated in the compliance checklist; and an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year.

88.     Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the Storm Water Permit, or  the Storm Water Permit requires a Level 2 ERA and the preparation of a Level 2 ERA Report should they exceed a NAL for two consecutive reporting years, for any required sampling and analysis parameter under the Storm Water Permit. The ERA Evaluation

1    should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances

2    and comply with the Storm Water Permit. Based upon the ERA Evaluation(s), the discharger shall

3    as soon as practicable, but not later than January 1, submit an ERA Report and certify that the ERA

4    Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP

5    revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA reports

6    require more stringent requirements than a Level 1 ERA report.

7    **V.**      **STATEMENT OF FACTS**

8         **A.**      **Stericycle, Inc. Facility Site Description**

9         89.      Defendant owns and operates an industrial facility located at 4135 West Swift

10    Avenue Fresno, CA 90058 that processes and treats medical waste.

11         90.      Facility's NOI states that the site encompasses approximately 1.64 acre, with 0.97

12    acres exposed to storm water and operates twenty-four (24) hours per day, seven (7) days a week.

13         91.      Pursuant to the NOI and SWPPP state that the Stericycle Facility operates under

14    Standard Industrial Classification (SIC) Code 4953, covering refuse systems hazardous waste

15    facilities and landfills (Landfills and Land Application Facilities or Refuse Systems).

16         92.      The Facility's August 2018 SWPPP ("Facility SWPPP") requires testing for pH,

17    TSS, O&G, ammonia ("NH"), magnesium ("Mg"), chemical oxygen demand ("COD"), arsenic

18    ("As"), cyanide ("Cn"), lead ("Pb"); mercury ("Hg"), selenium ("Se"), and silver ("Ag"), a broader

19    set of parameters than required by the Storm Water Permit under the Facility's stated Standard

20    Industrial Classification code ("SIC") though the 2018 SWPPP states that the above parameters

21    were selected based upon the Facility's SIC Code. Facilities must also sample and analyze for

22    additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source

23    assessment, as required by the General Permit and the Regional Board, and additional parameters

24    related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI.B.6.

25         93.      Under SIC Code 4953, the Storm Water Permit requires to analyze storm water

26    samples at Facility for TSS, pH, O&G, and iron ("Fe"). Upon information and belief, the Facility's

27    Owners/Operators do not sample storm water for iron.

28         94.      Plaintiffs are informed and believe, and thereon allege, that industrial activities at

Facility include solid waste compacting, waste water treatment, use of large-scale industrial compressors, storage of treated and untreated waste, loading and unloading of containers of medical waste or garbage for treatment and/or disposal, storage of medical waste roll bins, trailer and wooden pallet storage, and roof exhaust via roof stacks from the industrial processes within the main warehouse building such as wash line exhaust, autoclave waste treatment process exhaust, and boiler exhaust. Many industrial activities are conducted outside or without adequate cover and are exposed to storm water, while others conducted under cover are exposed to building openings, cooling and ventilation systems, which allow pollutants to escape where they are contacted by storm water and discharged offsite.

95.     Plaintiffs are informed and believe, and thereon allege that pollutant sources contributing to storm water contamination at the Facility include, but are not limited to: biohazardous waste, polluted condensate, dust, debris and oil from vehicles and vehicle traffic, solid waste and pollutants from solid waste handling, treated waste and debris and residue from treating waste, compressor leaks or blowdown, wood debris from pallet use and storage, residue and pollutants from condensate and sump leaks and spills, residue and debris from the roll bins, particulate matter and suspended solids from other industrial materials and processes, sediment accumulation throughout the Facility including on the roof of the warehouse building which is carried offsite with storm water flows.

96.     According to the Facility SWPPP, the Facility is divided into two (2) drainage areas. Storm water associated with industrial activities pursuant to the General Permit is collected and discharged from the two (2) drainage areas. Storm water collected from the storm drains at the site enter the MS4 system which flows to the San Joaquin River. San Joaquin River is a water of the United States within the meaning of the CWA.

**B.     The San Joaquin River**

97.     A vitally wildlife corridor and a source of irrigation water as, the San Joaquin River is one of two major rivers that create the Sacramento-San Joaquin Delta ("Delta"), California's most crucial water and ecological resource. This expansive inland river delta and estuary in Northern California is formed at the western edge of the Central Valley and formed by the Sacramento River

1   flowing south to meet the north-flowing San Joaquin River south of Sacramento, where the rivers

2   mingle with smaller tributaries and tidal flows. The longest river in the Central Valley at 366-miles,

3   the San Joaquin River starts in the high Sierra Nevada, and flows through the rich agricultural

4   region of the northern San Joaquin Valley before reaching Suisun Bay, San Francisco Bay, and the

5   Pacific Ocean.

6   98.     The San Joaquin River and the Delta are home to over 500 plant and animal species

7   including the critically endangered Delta Smelt, a species that has been listed as endangered under

8   California Endangered Species Act since 2010. Including the Delta Smelt, the San Joaquin River

9   and the Delta are home to at least 55 species of fish, including several Pacific salmon species,

10  striped bass, steelhead trout, American shad, sturgeon, perch, and lampreys. About two-thirds of

11  California's salmon pass through the Delta on their way upstream to spawn. Waterways in the Delta,

12  such as the San Joaquin River, have suffered a history of pollution. Municipal and industrial runoff,

13  along with pesticides and fertilizers have led to elevated levels of selenium, fluoride, nitrates and

14  other substances in these waterways. In part due this pollution, there are many other threatened

15  species and species of concern living in and the around the San Joaquin River and the greater Delta.

16  **C.      The Facility Storm Water Permit Coverage**

17  99.     The State Board's electronic database, called the Storm Water Multiple Application

18  & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification

19  ("WDID") number for the Facility as 5F10I026017. SMARTS lists the Facility coverage under the

20  Storm Water Permit as "Active."

21  100.    The NOI for the Facility lists the Receiving Water as the San Joaquin River,

22  indirectly.

23  101.    Via search of the SMARTS database, Plaintiffs obtained a SWPPP for the Facility

24  dated July 2020.

25  102.    Plaintiffs are informed and believe, and thereon allege, that the Facility SWPPP fails

26  to describe and/or adequately describe all of the industrial activities and significant materials at the

27  Facility

28  103.    Plaintiffs are informed and believes, and thereon allege, that Facility

1  Owners/Operators have failed to evaluate pollutants and their sources on site and implement BMPs

2  that achieve compliance with Storm Water Permit or the CWA.

3       104.    Plaintiffs are informed and believe, and thereon allege, that pollutants associated

4  with the Facility include, but are not limited to: pH, TSS, O&G, COD, Mg, Zn, NH, Cu, N+N, and

5  Fe.

6       105.    Plaintiffs are informed and believe, and thereon allege, that without properly

7  identifying all industrial activities or all significant materials at Facility in the SWPPP, the

8  Owners/Operators have not developed and/or implemented all appropriate BMPs.

9       106.    Plaintiffs are informed and believe, and thereon allege, that the Facility SWPPP

10  failed to implement the minimum BMPs required by the General Permit, including: sufficient good

11  housekeeping requirements; preventive maintenance requirements; aerial deposition control;

12  material handling and waste management requirements; employee training and quality assurance;

13  and record keeping.

14       107.    Plaintiffs are informed and believe, and thereon allege, that Stericycle has further

15  failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its

16  storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs;

17  containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs

18  necessary to comply with the General Permit's effluent limitations. Storm Water Permit, Sections

19  X.H.2.

20       108.    Plaintiffs are informed and believe, and thereon allege, that there are minimal BMPs

21  implemented or planned for implementation, pursuant to the Facility SWPPP and Exceedance

22  Response Actions ("ERA") reports.

23       109.    Plaintiffs are informed and believes, and thereon allege, that Defendant has failed to

24  collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at

25  least September 30, 2015.

26       110.    Plaintiffs are informed and believe, and thereon allege, that violations of pH, TSS,

27  O&G, COD, Mg, Zn, NH, Cu, N+N, and Fe occur each time storm water or non-storm water

28  discharges from Facility in violation of the Storm Water Permit Discharge Prohibitions III.C and

III.D, Receiving Water Limitations VI.A, VI.B.

111.     Plaintiffs are informed and believe, and thereon allege, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

112.     Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

113.     Plaintiffs are informed and believes, and thereon allege, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

114.     Plaintiffs are informed and believe, and thereon allege, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

115.     Plaintiffs are informed and believe, and thereon allege, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

**D.     Storm Water Discharges from the Facility**

116.     As detailed in the 2020 Facility SWPPP, the Facility has a total of (2) two discharge points (drain inlets) which drain two (2) drainage areas (more fully described in **Exhibit A)** that

flow into City of Fresno MS4 system which, upon information and belief, flows to the San Joaquin River.

117.    Pursuant to the Facility SWPPP, Drainage area 1 discharges storm water from the southeast side of the property near the truck parking area (Sampling Point 1) and drains storm water from the truck parking area, on the southeast side of the facility with accumulated pollutants from the loading docks, compactor use, waste disposal area, container storage area, and from the roof of the main building containing pollutants from sediment and roof exhaust mechanisms; drainage area 2 discharges storm water from the northwest section of the site next to the outdoor storage area (Sampling Point 2), and drains storm water from the back outdoor storage area, the sump, the pallet storage area, the trailer storage are, and storm water polluted with exhaust and sediment from the roof.

**E.  The Facility' Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

118.    Plaintiffs are informed and believe, and thereon allege, that pollutants from the Facility discharge into the San Joaquin River.

119.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

120.    Plaintiffs are informed and believe, and thereon allege, that the San Joaquin River is a water of the United States, and/or a tributary to a traditionally navigable water.

121.    Plaintiffs are informed and believe, and thereon allege, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

122.    Storm water discharges containing pollutants, including but not limited to, heavy metals such as Zn, Fe, and Cu adversely affect the aquatic environment.

123.    Samples of storm water discharges collected at the Facility contain pollutants including TSS, COD, Cu, Zn, Mg and O&G in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

124.    Plaintiffs are informed and believe, and thereon allege, that during and/or after every significant rain event[3] or any other storm water or non-storm water discharge that has occurred at the Facility since September 30, 2015, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

**F.      Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

125.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

126.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

127.    Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

128.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

129.    In the 2016-2017 reporting year, only three (3) rain events were sampled; in the 2017-2018 reporting only two (2) rain events were sampled, in violation of the Storm Water Permit.

---

[3] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

130. Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

131. Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators of the Facility consistently fail to perform visual observations of storm water during QSEs.

132. Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

133. Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

134. Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

135. Information available to Plaintiffs also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

136. Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

## VI.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

137. Plaintiffs incorporates the allegations contained in the above paragraphs as though fully set forth herein.

138. Plaintiffs are informed and believe, and thereon allege, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

139.     Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

140.     The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

141.     Plaintiffs are informed and believe, and thereon allege, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

142.     Each day since at least September 30, 2015 that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

143.     By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 30, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

144.     An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiffs has no plain, speedy, or adequate remedy at law.

145.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

**SECOND CAUSE OF ACTION**
**Defendant's Discharges of Contaminated Storm water in Violation of**
**the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

146. Plaintiffs incorporates the allegations contained in the above paragraphs as though fully set forth herein.

147. Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

148. Plaintiffs are informed and believe, and thereon allege, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

149. The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

150. Plaintiffs are informed and believe, and thereon allege, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

151. Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

152. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 30, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

153. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1    irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which

2    harm they have no plain, speedy, or adequate remedy at law.

3        154.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

4    actual controversy exists as to the rights and other legal relations of the Parties.

5        WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

6
## THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or**
7    **Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
8    **33  U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

9        155.    Plaintiffs incorporates the allegations contained in the above paragraphs as though

10   fully set forth herein.

11       156.    Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators

12   have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the

13   Storm Water Permit.

14       157.    Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators

15   have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of

16   the Storm Water Permit.

17       158.    Plaintiffs are informed and believe, and thereon allege, that Owners/Operators have

18   failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm

19   Water Permit.

20       159.    The Owners/Operators have been in violation of the Storm Water Permit at the

21   Facility every day from September 30, 2015 to the present.

22       160.    The Owners'/Operators' violations of the Storm Water Permit and the CWA at the

23   Facility are ongoing and continuous.

24       161.    The Owners/Operators will continue to be in violation of the Storm Water Permit

25   and the CWA each and every day the Owners/Operators fail to adequately develop, implement,

26   and/or revise the SWPPP for the Facility.

27       162.    Each and every violation of the Storm Water Permit's SWPPP requirements at the

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1   Facility is a separate and distinct violation of the CWA.

2      163.    By committing the acts and omissions alleged above, the Owners/Operators are

3   subject to an assessment of civil penalties for each and every violation of the CWA occurring from

4   September 30, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§

5   1319(d), 1365, and 40 C.F.R. § 19.4.

6      164.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the

7   CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

8   irreparably harm Plaintiffs, its members, and the citizens of the State of California, for which harm

9   they have no plain, speedy, or adequate remedy at law.

10      165.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

11   actual controversy exists as to the rights and other legal relations of the Parties.

12      WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

13   **<u>FOURTH CAUSE OF ACTION</u>**

14   **Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring and Reporting Plan in Violation of**
15   **the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
16

17      166.    Plaintiffs incorporates the allegations contained in the above paragraphs as though
18   fully set forth herein.

19      167.    Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators

20   have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the

21   Storm Water Permit.

22      168.    Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators

23   have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the

24   Storm Water Permit.

25      169.    Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators

26   have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the

27   Storm Water Permit.

28      170.    The Owners/Operators have been in violation of the Storm Water Permit's

1    monitoring requirements at the Facility every day from September 30, 2015 to the present.

2    171.   The Owners'/Operators' violations of its Storm Water Permit's monitoring

3    requirements and the CWA at the Facility are ongoing and continuous.

4    172.   The Owners/Operators will continue to be in violation of Section XI of the Storm

5    Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or

6    revise an MIP for the Facility.

7    173.   Each and every violation of the Storm Water Permit's MIP requirements at the

8    Facility is a separate and distinct violation of the CWA.

9    174.   By committing the acts and omissions alleged above, the Owners/Operators are

10   subject to an assessment of civil penalties for each and every violation of the CWA occurring from

11   September 30, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§

12   1319(d), 1365, and 40 C.F.R. § 19.4.

13   175.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the

14   CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

15   irreparably harm Plaintiffs, its members, and the citizens of the State of California, for which harm

16   they have no plain, speedy, or adequate remedy at law.

17   176.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

18   actual controversy exists as to the rights and other legal relations of the Parties.

19   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

20   **FIFTH CAUSE OF ACTION**
     **Defendant's Failure to Report as Required by the Storm Water**
21   **Permit in Violation of the Storm Water Permit and the**
     **Clean Water Act.**
22   **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

23   177.   Plaintiff incorporates the allegations contained in the above paragraphs as though

24   fully set forth herein.

25   178.   Plaintiffs are informed and believe, and thereon allege, that the Facility

26   Owners/Operators have failed and continue to fail to sufficiently sample and analyze storm water in

27   any reporting year at issue in this Complaint.

28

179.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

180.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners/Operators failed and continue to fail to submit sufficient ERA Reports to the Regional Board for the Facility, despite repeat storm water sample analysis requiring BMP upgrades at the Facility, in violation of Section XII(C) of the Storm Water Permit.

181.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the Storm Water Permit.

182.    Plaintiffs are informed and believe, and thereon allege, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

183.    The Facility Owners/Operators have been in violation of Sections XI, XII and XVI of the Storm Water Permit since at least September 30, 2015.

184.    The Facility Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations and Sections XI, XII(C) and XVI of the Storm Water Permit.

185.    The Owners/Operators have been in violation of Sections XI, XII(C) and XVI of the Storm Water Permit since at least September 30, 2015.

186.    The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

187.    By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 30, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

188.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

189.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

190.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.   A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.   A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.   A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015 of $55,800 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

e.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

1        f.      Any other relief as this Court may deem appropriate.

2

3   DATED: December 15, 2020

4

5
                                                    /s/Anthony M. Barnes
6                                                   Anthony M. Barnes
                                                    AQUA TERRA AERIS LAW GROUP
7                                                   Attorneys for Plaintiff
                                                    California Sportfishing Protection
8                                                   Alliance

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES